**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **MICHAEL A. FARLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ANTHONY R. STACY and** | ) | **Case No. 14-CV-0008-JHP-PJC** |
| | ) | |
| **PAUL A. ROSS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION & ORDER

Before the Court are Defendant Paul Ross's Motion for Summary Judgment [Doc. No. 66], Defendant Anthony R. Stacy's Motion for Summary Judgment [Doc. No. 68]. After consideration of the briefs, and for the reasons stated below, Paul Ross and Anthony R. Stacy's Motions for Summary Judgment are both **GRANTED**.

## BACKGROUND

In early 2010, Plaintiff Michael A. Farley ("Farley" or "Plaintiff") invested a total of $751,215.74 into the Palo Verde Fund, LP (the "Partnership"), which was operated by Plaintiff's friends, Defendants Paul Ross ("Ross") and Anthony R. Stacy ("Stacy") (collectively, "Defendants"). Prior to his investment, Farley alleges that Defendants represented to him that the investment would earn 14% interest and would remain liquid. By March 1, 2010, Farley accepted a Subscription Booklet [Doc. No. 66-1] and an accompanying Confidential Private Placement Memorandum (the "Memorandum") [Doc. No. 66-2] in connection with his investment in the Partnership. Farley initialed terms throughout the Subscription Booklet and signed his agreement to the Subscription Booklet's terms on March 1, 2010.

1

In the Subscription Agreement attached to the Subscription Booklet, Farley represented and warranted that—

    a.  "[He] evaluated the risk of investing in the Partnership Interests and [acquired] the Partnership Interests based only upon [his] independent examination and judgment as to the prospects of the Partnership as determined from information obtained directly by [himself] from the Partnership or its authorized representatives."

    b.  He was an "eligible investor" as that term was defined in the Memorandum.

    c.  "The Partnership is an investment that involves a high degree of risk and [he] can sustain a substantial loss of this investment in the Partnership Interests."

[Doc. No. 66-1, "Exhibit C," at 1-2].

Farley further acknowledged that—

    a.  He received "all information requested of the Partnership, and further acknowledge[d] that no representations or warranties [were] made to [him] by the Partnership, the General Partner or any representative or agent of the Partnership, other than set forth in the Memorandum and the Partnership Agreement."

    b.  "[He purchased] the Partnership Interests relying solely on information furnished in the Memorandum and the Partnership Agreement."

    c.  "[He] received and carefully read and [was] familiar with the Partnership Agreement and the Memorandum" and was "purchasing the Partnership Interests relying only on the information set forth in the Partnership Agreement and Memorandum."

[*Id.* at "Exhibit C," at 3].

Farley further agreed in the Subscription Booklet that "any representations made [under the Subscription Agreement] will be deemed reaffirmed by [him] at any time [he] makes an additional capital contribution to the Partnership and the act of making such additional contribution will be evidence of such reaffirmation." [*Id.* at "Exhibit C," at 5.] Farley also chose not to "irrevocabl[y] elect[] to opt-out of the Partnership's alternative investment program." [*Id.* at "Exhibit C," at 1].

The Memorandum informed Farley that—

a.  "Partnership Interests are suitable only for sophisticated investors (a) who do not require immediate liquidity for their investments . . . and (c) who fully understand and are willing to assume the risks involved in the Partnership's investment program.  The Partnership's investment practices, by their nature, involve a substantial degree of risk. . . . Prospective investors should carefully consider the material factors described at "*Risk Factors*," together with the other information appearing in this Memorandum, prior to purchasing any of the Partnership Interests offered hereby."  [Doc. No. 66-2, ii].

b.  "No person has been authorized to make any representation with respect to the Partnership Interests except the representations contained herein. Any representation other than those set forth in this Memorandum and any information other than that contained in documents and records furnished by the Partnership upon request, must not be relied upon."  [*Id.* at iii].

c.  "Each investor submitting an initial subscription shall be permitted to opt-out of participating in the Partnership's alternative investments by indicating such election on its subscription agreement.  Such election may only be made by an investor at the time of its initial subscription and, if made, shall be irrevocable."  [*Id.* at 4].

d.  "Each Limited Partner electing to make an additional capital contribution, at the time of such contribution, shall be permitted to have such amounts opt-out of participation in the Partnership's alternative investments by notifying the General Partner in writing of such election. Such election may only be made by a Limited Partner at the time of its additional capital contribution and, if made, shall be irrevocable and only apply to the amount of additional capital contributed."  [*Id.* at 4].

e.  "The General Partner may, at any time, designate a Partnership investment that the General Partner believes either lacks a readily assessable market value or should be held until the resolution of a special event or circumstances (each such investment, a 'Side Pocket Investment')."  [*Id.* at 5].

f.  "In general, investment in the Partnership Interests involves various and substantial risks, including the risk that the Partnership assets may be invested in high risk investments, risks for certain tax-exempt investors, risks related to the limited transferability of a Limited Partner's interest in the Partnership, the lack of operating history of the Partnership, the Partnership's dependence upon the General Partner, and certain tax risks."  [*Id.* at 6].

g.  "The General Partner is granted virtually unlimited latitude in selecting alternative investments for the Partnership."  [*Id.* at 16].

h.  "There can be no assurance that the Partnership will achieve its investment objective or avoid substantial losses."  [*Id.* at 17].

3

i. "Because risks are inherent in all the investments in which the Partnership engages, no assurances can be given that the Partnership's investment objectives will be realized." [*Id.* at 17].

j. "The Partnership may invest part of its assets in investments that the General Partner believes either lack a readily assessable market value or should be held until the resolution of a special event or circumstances (*i.e.*, Side Pocket Investments). Generally, each investment made by the Partnership in an alternative investment will be held in a separate Side Pocket Investment Account. The Partnership may not be able to readily dispose of Side Pocket Investments and, in some cases, may be contractually prohibited from disposing of such investments for a specified period of time." [*Id.* at 30].

k. "Risk of Loss. A Limited Partner could incur substantial, or even total, losses on an investment in the Partnership. The Limited Partnership Interests are only suitable for persons willing to accept this high level of risk." [*Id.* at 33].

l. "Lack of Liquidity. The Partnership's redemption provisions place certain restrictions on the right to redeem all or part of its Interests, transfer its Interests and pledge or otherwise encumber its Interests. Thus, it is unlikely that a holder of Interests will be able to liquidate its Interests in the event of an unanticipated need for cash . . . an investment in the Partnership would not be suitable for an investor who needs liquidity." [*Id.* at 33].

m. "AN INVESTMENT IN THE PARTNERSHIP INTERESTS IS SUITABLE ONLY FOR INVESTORS OF SUBSTANTIAL FINANCIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT." [*Id.* at 60].

The "Risk Factors" section of the Memorandum reiterates and further describes the risk factors at stake for potential investors. [*Id.* at 18-38].

On March 24, 2011, Farley subscribed for two additional purchases of $500,000 and $4,000 of Partnership Interests in the Partnership. [Doc. Nos. 66-5, 66-6]. In each of the two "Additional Subscription Requests" that Farley signed, Farley "reaffirm[ed] . . . all of the representations, warranties and acknowledgements previously made in the Subscription Agreement executed by [him]." [*Id.*] In those agreements, Farley additionally declined to "irrevocabl[y] elect[] to opt-out of the Partnership's alternative investment program." [*Id.*]

On January 6, 2014, Farley filed a Complaint against Ross and Stacey. [Doc. No. 2]. In his First Amended Complaint, Farley alleges that Ross and Stacey made misrepresentations and omissions related to Farley's investment in the Partnership, which resulted in significant financial losses to Farley. Farley also alleges that Defendants improperly used Plaintiff's investment to make a loan from the Partnership to the Palo Verde Private Equity Fund without his knowledge or consent. Farley asserts six counts against Defendants: violations of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder (Count I); violations of the Oklahoma Uniform Securities Act (Count II); breach of contract (Count III); actual fraud (Count IV); constructive fraud (Count V); and breach of fiduciary duty (Count VI). [Doc. No. 9].

On March 18, 2015, Ross filed a Motion for Summary Judgment on all counts. [Doc. No. 66]. Ross argues that Farley cannot prove that Ross (i) violated the Securities Exchange Act of 1934; (ii) committed actual fraud; (iii) breached a contract; or (iv) breached a fiduciary duty. Ross also argues that the statute of limitation bars Farley's causes of action for (i) violations of the Securities Exchange Act of 1934; (ii) violations of the Oklahoma Uniform Securities Act; (iii) actual fraud; (iv) constructive fraud; and (v) breach of fiduciary duty. On March 23, 2015, Stacy filed a Motion for Summary Judgment based on the same grounds as Ross. [Doc. No. 68]. Stacy's brief adopted and incorporated by reference the exact language as filed by Ross in his Motion for Summary Judgment. On March 26, 2015, Farley filed a Response in Opposition to Ross's Motion for Summary Judgment [Doc. No. 70] and an Objection and Response in Opposition to Stacy's Motion for Summary Judgment [Doc. No. 71]. Ross filed a Reply on April 9, 2015.

## DISCUSSION

As a general rule, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## I.      Plaintiff's Rule 56 Objections

As a threshold matter, the Court must address Plaintiff's objection to the admissibility of evidence Ross supplied as exhibits to his Motion. Plaintiff asserts that Defendants' Statement of Undisputed Facts[1] improperly relies upon inadmissible hearsay evidence, which this Court may not consider on summary judgment. [Doc. No. 70 at 3]. In particular, Plaintiff argues that Defendants offer, for the truth of the matters asserted therein, the following exhibits: the Subscription Booklet [Doc. No. 66-1], Private Placement Memorandum [Doc. No. 66-2], Additional Subscription Requests [Doc. Nos. 66-5, 66-6], May 31, 2011, letter to investors [Doc. No. 66-7], and Loan Agreement [Doc. No. 66-8]. Farley also objects to Defendants' submission of the Affidavit of Paul Ross as self-serving and therefore inadmissible.

---

[1] Because Stacy's Motion for Summary Judgment and Brief in Support incorporates the exact language in Ross's Motion for Summary Judgment in its entirety, the Court will address both Motions as though they were filed as one brief.

The Plaintiff correctly notes that the Court may review only admissible evidence in weighing a motion for summary judgment. *See Johnson v. Weld County*, 594 F.3d 1202, 1209 (10th Cir. 2010). Hearsay evidence is inadmissible evidence that may not be considered for summary judgment purposes. Fed. R. Evid. 802. "An out-of-court statement is considered 'hearsay' if it is offered 'to prove the truth of the matter asserted.'" *United States v. Brinson*, 772 F.3d 1314, 1322 (10th Cir. 2014) (quoting Fed. R. Evid. 801(c)(2).

The Court finds, however, that the Subscription Booklet, Private Placement Memorandum, and Additional Subscription Requests are not inadmissible hearsay, because they are not offered for the truth of the matter asserted. Defendants offer the Subscription Booklet, Private Placement Memorandum, and Additional Subscription Requests not for their truth, but rather as "verbal acts." As the Advisory Committee explained, "The effect is to exclude from hearsay the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights." Fed. R. Evid. 801(c) Advisory Committee Notes. A "verbal act" is "[a] statement offered to prove the words themselves because of their legal effect (e.g., the terms of a will)." Black's Law Dictionary (10th ed. 2014). "A contract, for example, is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay." *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992). *See also Cagle v. The James St. Grp.*, 400 F. App'x 348, 356 (10th Cir. 2010) (contract was not hearsay because is "constituted an act of legal significance between [plaintiff] and her attorneys, not a 'statement' offered for its truth.").

In their Motion for Summary Judgment, Defendants offer the Subscription Booklet, Private Placement Memorandum, and Additional Subscription Requests to show that Farley knew or should have known that the oral representations allegedly made by Defendants were

false as early as March 1, 2010. Further, The Subscription Booklet, Private Placement Memorandum, and Additional Subscription Requests are offered as documentation of the contract between the Partnership and Farley. As such, the statements contained within these documents are not inadmissible hearsay, because they contain legal significance separate and apart from their truth.

Nonetheless, the Court does find that the May 31, 2011, letter to investors and Loan Agreement constitute hearsay and are therefore inadmissible and will not be considered in the Court's ruling herein.

With respect to Ross' affidavit, the Court will consider only information that is "based on personal knowledge" and set forth "facts that would be admissible in evidence." *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) (quoting *Garrett v. Hewlett–Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002)). The Court will not consider statements that are "conclusory and self-serving." *Id.* (quoting *Garrett*, 305 F.3d at 1213).

## II.     Plaintiff's Objection to Stacy's Motion for Summary Judgment as Untimely

Plaintiff separately objects to Stacy's Motion for Summary Judgment on the ground that it is untimely. Plaintiff argues that, because Stacy submitted his Motion for Summary Judgment on March 23, 2015, five days after the March 18, 2015, dispositive motion deadline, the Court should deny the Motion in its entirety. Plaintiff's objection is not well-taken.

While Stacy did file his Motion for Summary Judgment out of time, the Court observes that Stacy is appearing *pro se* in this matter and therefore did not have the benefit of having an attorney draft a dispositive motion on his behalf. Notably, Stacy's Motion does not raise any new issues and incorporates the language in Ross's Motion for Summary Judgment in its entirety. Plaintiff had an opportunity to respond to Stacy's Motion and did so in a separate

Objection and Response [Doc. 71]. Plaintiff does not allege, and the Court fails to see, any prejudice that would result to Plaintiff if the Court accepts the late-filed Motion. For these reasons, and in the interest of justice, the Court accepts Stacy's Motion for Summary Judgment and overrules Plaintiff's objection.

## III.    Securities Exchange Act (Count I)

In order to establish a violation of section 10(b) of the Securities Exchange Act of 1934, a plaintiff must prove:  "(1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages."  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997). *See* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5.  In the Tenth Circuit, a plaintiff must prove that he "justifiably relied" on the misleading statement or omission of a material fact to his detriment. *Zobrist v. Coal-X, Inc.* 708 F.2d 1511, 1516 (10th Cir. 1983).  "Justifiable reliance is not a theory of contributory negligence; rather, it is a limitation on a Rule 10b-5 action which insures that there is a causal connection between the misrepresentation and the plaintiff's harm."  *Id.*

In order to determine whether reliance was justifiable, the court considers a number of relevant factors:

> (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Id.*  All factors are to be balanced and considered in order to determine whether reliance was justifiable.  *Id.*  "No single factor is determinative."  *Id.* at 1516-17.  At a minimum, however, a plaintiff may not "intentionally close his eyes and refuse to investigate, concerning the circumstances, in disregard of a risk known to him, or so obvious that he must be taken to have

been aware of it, and so great as to make it highly probable that harm would follow." *Id.* at 1517. In other words, "a plaintiff may not reasonably or justifiably rely on a misrepresentation where its falsity is palpable" under the circumstances. *Holdsworth v. Strong*, 545 F.2d 687, 694 (10th Cir. 1976).

In this regard, when determining whether the plaintiff justifiably relied on the defendant's misrepresentation, the Tenth Circuit imputes knowledge of information contained in a prospectus or its equivalent to the investors who received these documents, even if the investors did not read such documents. *Zobrist*, 708 F.2d at 1518. Knowledge is imputed "only to the extent to which such information actually was disclosed." *Id.* The plaintiff is not charged "with information that a knowledgeable investor would infer from the printed words or numbers." The court imputes "knowledge of the printed words or numbers only." *Id.* In *Zobrist*, the Tenth Circuit explained that knowledge of such documents should be imputed to investors, because it saw no reason to reward investors who "throw caution and prospectuses to the wind." *Id.* Thus, when a document of this kind has been provided to the plaintiff, the various factors for determining justifiable reliance "must be examined as if [the plaintiff] were aware of the warnings contained in the memorandum." *Id.*

In the case at hand, an analysis of the above factors reveals that, as a matter of law, Plaintiff's reliance on Defendants' alleged misrepresentations was not justified. Farley was provided with the Memorandum before he invested in the Partnership. [Doc. Nos. 66-1, 66-2. *See* Doc. No. 66-1, 1 ("This Subscription Booklet must not be used if it is not accompanied by a copy of the Memorandum")]. Knowledge of the contents of the Memorandum is accordingly imputed to Farley. *See Zobrist*, 708 F.2d at 1518. Imputing the knowledge of the contents of the

Memorandum to Plaintiff, it becomes clear that any reliance on the alleged misrepresentations of the Defendants was not justified.

First, Farley alleges that Defendants met with him in person on multiple occasions and promised returns exceeding 14% in connection with the investment. [Doc. No. 9 at ¶ 13]. However, the Memorandum directly contradicts this representation. On its first page, the Memorandum states that investing in the Partnership involves a "substantial degree of risk" and reiterates in the "Risk Factors" section that investment in the Partnership "involves various and substantial risks." [Doc. No. 66-2, ii, 6]. The Memorandum also warns in the "Risk of Loss" section that an investor "could incur substantial, or even total, losses on an investment in the Partnership." [*Id.* at 33]. Further, the Memorandum states that "no person has been authorized to make any representation" with respect to the investment, other than those contained in the Memorandum. [*Id.* at iii]. As in *Zobrist*, "[n]ot only did the defendants not conceal their fraud from [plaintiff], they provided him with information and warnings which exposed the representations as false." 708 F.2d at 1518. The warnings throughout the Memorandum, which were fully accessible to Plaintiff at the time of his investment, plainly indicate that his reliance on the promised 14% returns was unjustified as a matter of law.

Second, Plaintiff alleges that Defendants represented that his investment in the Partnership would be liquid, and that he could remove his assets at any time. [Doc. No. 9, ¶ 26]. The Memorandum also directly contradicts this alleged representation, by stating repeatedly that an investment in the Partnership lacks liquidity and is not suitable for investors who require liquidity. [Doc. No. 66-2, ii ("Partnership Interests are suitable only for sophisticated investors . . . who do not require immediate liquidity for their investments"), 33 ("it is unlikely that a holder of Interests will be able to liquidate its Interests in the event of an unanticipated need for cash."),

60 ("AN INVESTMENT IN THE PARTNERSHIP INTERESTS IS SUITABLE ONLY FOR INVESTORS OF SUBSTANTIAL FINANCIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT.")].  As with the promised 14% return, Plaintiff's reliance on the promised liquidity of his investment was unjustified in light of the clearly contradictory statements in the Memorandum.

Third, Plaintiff alleges that Defendants improperly used Plaintiff's investment to make a loan from the Partnership to the Palo Verde Private Equity Fund without his knowledge or consent.  [Doc. No. 9 at ¶ 35].  However, the Memorandum explains in the "Alternative Investments" section that the General Partner may acquire "alternative investments," which may include "lending activities."  [Doc. No. 66-2, 16].  Moreover, the Memorandum provides that the General Partner is "granted virtually unlimited latitude in selecting alternative investments for the Partnership."  [*Id.*].  Another section of the Memorandum explains that certain alternative investments may "either lack a readily assessable market value or should be held until the resolution of a special event or circumstances" and that the Partnership "may not be able to readily dispose" of such investments and "may be contractually prohibited from disposing of such investments for a specified period of time."  [*Id.* at 30].  In light of these plain disclosures in the Memorandum, which directly contradict Defendants' alleged representation that Farley's investment "would be liquid" [*see* Doc. No. 9, ¶¶ 26, 34], Farley's reliance on Defendants' alleged representations or omissions to the contrary was unjustified as a matter of law.  *See, e.g., Buford White Lumber Co. Profit Sharing & Sav. Plan & Trust v. Octagon Properties, Ltd.*, 740 F. Supp. 1553, 1566 (W.D. Okla. 1989) (explaining that the presumption of reliance in an omissions case may be conclusively rebutted by facts showing the plaintiff's reliance was unreasonable as a matter of law).

In addition to the Memorandum, Plaintiff signed a Subscription Booklet, which is a much more concise 16 pages long. [Doc. No. 66-1]. By signing the Subscription Booklet, Plaintiff acknowledged that: (i) he "received and carefully read" the Memorandum; (ii) he was purchasing the Partnership Interests "relying only on the information set forth in the Partnership Agreement and Memorandum; and (iii) no representations or warranties were made to him other than as set forth in the Memorandum and Partnership Agreement. [Doc. No. 66-1, "Exhibit C," at 3]. Plaintiff also represented and warranted that: (i) he was an "eligible investor" as defined in the Memorandum; (ii) he could sustain a "substantial loss" of his investment; and (iii) the investment involved a "high degree of risk." [*Id.* at "Exhibit C," at 2]. Importantly, Plaintiff reaffirmed these representations, warranties, and acknowledgements when he made his subsequent investments in the Partnership the following year. [Dkt. Nos. 66-5, 66-6]. Given that the Memorandum expressly contradicts the misrepresentations alleged by the Plaintiff, the falsity of the representations would have been palpable to Plaintiff at the time he received them, had he exercised diligence by reviewing them.

Plaintiff has also failed to demonstrate "compelling reasons for passively accepting the contradictions" between Defendants' alleged misrepresentations and the information contained in the Memorandum and Subscription Booklet. *Zobrist*, 708 F.2d at 1518. Plaintiff contends that the close relationship between Plaintiff and the two Defendants constitutes such a compelling reason, relying heavily on the Tenth Circuit's decision in *Holdsworth v. Strong*, 545 F.2d 687 (10th Cir. 1997). However, the *Holdsworth* decision is readily distinguishable from the facts at hand.

In *Holdsworth*, the plaintiffs, a married couple, and defendant were shareholders in a closely held corporation, with the defendant owning the majority share. 545 F.2d at 689. The

plaintiffs did not participate in the management of the corporation, and their knowledge was restricted to information furnished by the defendant. *Id.* at 690. In addition to the closely held corporation, Mr. Holdsworth and the defendant owned a ranch together, and the parties were close friends. *Id.* at 690, 697. After more than a decade of owning the corporation together, the defendant came to the plaintiffs and represented that the company would no longer pay dividends because it had been forced to invade its capital to do so. *Id.* at 690. The next year, the defendant offered to buy out the plaintiffs for $1,500, again repeating his representation regarding nonpayment of dividends. *Id.* The plaintiffs agreed and sold their shares without first examining the corporate books and records. *Id.* at 690-91. Later, the plaintiffs learned that the company had realized a gross income exceeding $100,000 that year. *Id.* at 690. The plaintiffs then sued the defendant pursuant to Section 10(b) and Rule 10b-5 thereunder based on the defendant's misrepresentations.

The Tenth Circuit held that under those circumstances, the plaintiffs in *Holdsworth* reasonably relied upon the misrepresentations by the defendant. *Id.* at 697. In reaching its conclusion, the court considered the extremely close business and personal relationship between the plaintiffs and defendant, and, importantly, the fact that even if the plaintiffs had examined the books of the corporation, they would not have discovered the defendant's misrepresentation, because the books did not accurately reflect the condition of the company. *Id.* at 691, 697.

In the instant case, Plaintiff does allege a close relationship between Defendants and himself. [Doc. No. 9, ¶¶ 7-12]. Plaintiff even claims that the relationship gave rise to a fiduciary duty between the Plaintiff and the Defendants. [*Id.*, ¶¶ 128-130]. However, unlike in *Holdsworth*, Plaintiff in the case at hand knew or should have known facts that proved the falsity of Defendants' alleged misrepresentations. Importantly, in *Holdsworth*, even if the plaintiffs had

examined the books of the corporation before agreeing to the sale, they would not have discovered the misrepresentation. *See Zobrist*, 708 F.2d at 1516 (highlighting the fact that the plaintiffs in *Holdsworth* did not have access to contradictory information that would have revealed defendant's deception). In contrast, Plaintiff in this case was provided with a Memorandum and Subscription Booklet that specifically set forth warnings and risks associated with his investment that directly contradicted Defendants' alleged misrepresentations.

Given Plaintiff's imputed knowledge of the contents of the Memorandum, and the fact that the Memorandum's contents directly contradict the misrepresentations alleged by Plaintiff, this Court cannot find that Plaintiff reasonably relied upon the alleged misrepresentations. Despite Plaintiff's allegedly close friendship with Defendants, Plaintiff nonetheless acted recklessly "by intentionally closing his eyes to and failing to investigate the contradiction between the misrepresentations and the information in the [M]emorandum." *Zobrist*, 708 F.2d at 1518-19. Because Plaintiff cannot prove that his reliance on the misrepresentations was justifiable, he cannot prevail on a claim pursuant to Section 10(b) of the Securities Exchange Act or Rule 10b-5 thereunder.

## IV.     Breach of Contract (Count III)

Defendants argue that Plaintiff's claim for breach of contract (Count III) fails as a matter of law, because Plaintiff cannot prove that a contract existed between Plaintiff and either Defendant. In order for Plaintiff to recover on a cause of action for breach of contract, he must prove "that the parties had a valid contract, a breach of the contract occurred, and the plaintiff suffered damages resulting from the breach." *McGregor v. Nat'l Steak Processors, Inc.*, 2012 WL 2904547, at *3 (N.D. Okla. July 16, 2012). Further, "[c]ontracts are binding only upon those who are parties thereto." *Fleming v. Quail Creek Nursing & Rehab. Ctr.*, 2013 WL

4459494, at *2 n.3 (N.D. Okla. Aug. 19, 2013) (quoting *Wells Fargo Bank, N.A. v. Heath*, 280 P.3d 328, 334 (Okla. 2012)).

Here, Plaintiff entered into a contract with the Partnership, not with Defendants. The Subscription Agreement shows that the agreement was with the Partnership, not with the individual Defendants. [Doc. No. 66-1, "Exhibit C," p. 7]. Plaintiff has not alleged facts to demonstrate that the Defendants were a party to the contract. Plaintiff himself alleges that his contract was with PV Capital, the Palo Verde Private Equity Fund and the Trading Fund, not with Defendants in their individual capacities. [Doc. No. 9, ¶¶ 94-99]. Further, under the Oklahoma Statute of Frauds, OKLA. STAT. tit. 15, § 15-136(2), Plaintiff must present evidence that Defendants promised in writing to answer for the debt, default, or miscarriage of the Partnership, which he has not. Plaintiff's case law is not on point. Because there was no contract between Plaintiff and either Defendant in his individual capacity, there can be no breach. Therefore, Plaintiff's breach of contract cause of action fails as a matter of law.

## V.    Actual Fraud (Count IV)

In Count IV, Plaintiff alleges that Defendants committed actual fraud. [Doc. No. 9, ¶¶ 100-115]. Defendants argue that Plaintiff does not have sufficient evidence to establish each element of this claim. In Oklahoma, the elements of actionable fraud are:

> 1) a false material misrepresentation, 2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth, 3) with the intention that it be acted upon, and 4) which is relied on by the other party to his (or her) own detriment.

*Musket Corp. v. Star Fuel of Oklahoma*, 2012 WL 3595048, at *6 (W.D. Okla. Aug. 21, 2012). In addition, the plaintiff's reliance on representations or omissions must be justifiable. *Id. See also Buford White Lumber Co. Profit Sharing & Sav. Plan & Trust v. Octagon Properties, Ltd.*, 740 F. Supp. 1553, 1570 (W.D. Okla. 1989).

For the reasons stated above in Part III, Plaintiff's reliance on Defendants' alleged misrepresentations was not justifiable in light of the directly contradictory information in the Memorandum and Subscription Booklet; therefore, Plaintiff's actual fraud claim fails as a matter of law.

## VI.     Breach of Fiduciary Duty (Count VI)

Defendants also argue that Plaintiff does not present sufficient evidence to establish the element of his claim for breach of fiduciary duty (Count VI). To recover on a cause of action for breach of fiduciary duty, a plaintiff must prove: "(1) the existence of a fiduciary relationship, (2) a duty arising out of the fiduciary relationship, (3) a breach of the duty, and (4) damages proximately caused by the breach of duty." *F.D.I.C. v. Grant*, 8 F. Supp. 2d 1275, 1299 (N.D. Okla. 1998). "[T]he existence or non-existence of a fiduciary duty depends on the factual circumstances surrounding the parties' relationship and transactions." *Id.* at 1296 (citing *First Nat'l Bank and Trust Co. of Vinita v. Kissee*, 859 P.2d 502, 510-11 (Okla. 1993). "[A] fiduciary relationship springs from an attitude of trust and confidence and is based on some form of agreement, either express or implied, from which it can be said the *minds have been met* to create a mutual obligation." *Quinlan v. Koch Oil Co.,* 25 F.3d 936, 942 (10th Cir.1994) (quoting *Lowrance v. Patton*, 710 P.2d 108, 112 (Okla. 1985).

In the case at hand, Plaintiff has alleged sufficient facts to demonstrate an issue of material fact as to whether a fiduciary relationship existed between himself and Defendants. In his First Amended Complaint, Plaintiff alleges that he and Ross shared a "special relationship of trust as a result of their long-term friendship, and Plaintiff's historical reliance on Defendant Ross as his investment advisor." [Doc. No. 9 at ¶ 117]. He further alleges that he trusted and relied on Ross with regard to his investment. [*Id.* at ¶ 129]. With regard to Stacy, Plaintiff also

alleges he "shared a special relationship of trust and confidence as a result of their long-term friendship, and Plaintiff's historical reliance on Defendant Stacy as his investment advisor." [*Id.* at ¶ 118].

In his Motion for Summary Judgment, Ross argues that Plaintiff has not alleged facts sufficient to establish a fiduciary relationship between himself and Plaintiff. This Court disagrees. At the summary judgment stage, the court must determine only whether the Plaintiff has created a genuine issue of material fact. In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. Though Plaintiff provides sparse facts to support his allegation that a fiduciary relationship existed, Defendants provide only conclusory, self-serving allegations of fact to counter Plaintiff's claims. Therefore, the Court finds that Plaintiff has raised a genuine issue of material fact as to his claim for breach of fiduciary duty with respect to both Ross and Stacy.

## VII. Claims Barred by the Statute of Limitations

Defendants seek summary judgment with respect to each of Farley's claims, except for his breach of contract claim (Count III), on statute of limitations grounds. For the reasons described below, Farley's claims for violation of the Oklahoma Uniform Securities Act (Count II), constructive fraud (Count V), and breach of fiduciary duty (Count VI) are all barred by the applicable two-year statutes of limitations.

### A. Securities Exchange Act (Count I)

The statute of limitations for a securities fraud claim under Section 10(b) of the Securities Exchange Act of 1934 is set forth in 28 U.S.C. § 1658(b). *Merck & Co. v. Reynolds*, 559 U.S. 633, 638 (2010). That statute provides, in relevant part:

[A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of—

(1) 2 years after the discovery of the facts constituting the violation; or

(2) 5 years after such violation.

28 U.S.C. § 1658(b). The word "discovery," as used in Section 1658(b)(1), "encompasses not only those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known." *Merck & Co.*, 559 U.S. at 648. Thus, a cause of action for securities fraud accrues "(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation—whichever comes first.'" *Id.* at 637. "Facts constituting the violation" include facts showing the defendant made a misleading statement and that the defendant acted with "scienter," i.e., the intent to deceive, manipulate, or defraud the plaintiff, including recklessness. *Id.* at 637, 648-49; *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1259 (10th Cir. 2001).

With respect to the fact of misrepresentation in this case, as discussed above in Section III, Plaintiff is charged with the knowledge contained in the Subscription Booklet and Memorandum [Doc. Nos. 66-1, 66-2]. *See Zobrist*, 708 F.2d at 1518. This rule of imputation may apply in the context of the statute of limitations and the discovery rule. *See, e.g.*, *Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002). Because the Subscription Booklet and Memorandum directly contradict Defendants' alleged misrepresentations in the period leading up to Plaintiff's investment in the Partnership, he is deemed to have "discovered" Defendants' alleged misrepresentations regarding the liquidity and expected return on Plaintiff's investment in the Partnership when he received them, in March 2010.

With respect to the fact of scienter, however, the Court concludes that an issue of material fact remains whether Plaintiff "discovered" Defendants' alleged scienter outside the limitations period. The United States Supreme Court has stated that the statute of limitation "may require 'discovery' of scienter-related facts beyond the facts that show a statement (or omission) to be materially false or misleading." *Merck & Co.*, 559 U.S. at 650. Although certain statements "are such that, to show them false is normally to show scienter as well," in a 10(b) claim, the relation of factual falsity and state of mind is "more context specific." *Id.* In this case, Defendants have not shown that Plaintiff would have discovered Defendants' deceptive intent at the time Plaintiff received the Memorandum and Subscription Booklet. Accordingly, the Court will not grant summary judgment to Defendants on this ground. Nonetheless, as discussed above in Section III, this claim fails on the merits as a matter of law.

**B.      Oklahoma Uniform Securities Act (Count II)**

The statute of limitations for securities fraud under the Oklahoma Uniform Securities Act is set forth in OKLA. STAT. tit. 71 § 1-509(J)(2), which requires a plaintiff to institute an action "within the earlier of two (2) years after discovery of the facts constituting the violation or five (5) years after such violation." The Supreme Court of Oklahoma has held that this limitations period begins to run "after discovery of the facts or after such discovery should have been made by the exercise of reasonable diligence." *Horton v. Hamilton*, 345 P.3d 357, 362 (Okla. 2015) (internal quotation marks omitted). Unlike a Section 10(b) claim under the federal Securities Exchange Act, however, the fact of scienter is not among the "facts constituting the violation" with respect to a claim under the Oklahoma Uniform Securities Act. *Lilliard v. Stockton*, 267 F. Supp. 2d 1081, 1111 n.6 (N.D. Okla. 2003). Accordingly, the statute of limitations for Plaintiff's cause of action began to run when he discovered, or in the exercise of reasonable diligence

should have discovered, that he purchased interests in the Partnership by means of Defendants' misrepresentations. *Horton*, 345 P.3d at 362.

As discussed above, the Tenth Circuit imputes knowledge and information contained in a prospectus, or equivalent document, to the investors who received these documents—even if the investors did not read these documents. *Zobrist*, 708 F.2d at 1518. This rule of imputation may apply in the context of the statute of limitations and the discovery rule. *See Franze*, 296 F.3d at 1254. As discussed in the Court's above analysis in Section III, the Subscription Booklet and Memorandum [Doc. Nos. 66-1, 66-2] directly contradict Defendants' alleged misrepresentations in the period leading up to Plaintiff's investment in the Partnership. As a result, as of the date Plaintiff received the Memorandum and Subscription Booklet, he is deemed to have known of Defendants' alleged misrepresentations regarding the liquidity and expected return on Plaintiff's investment in the Partnership.

Plaintiff initially subscribed for an aggregate purchase of $751,215.74 of interests in the Partnership on or before March 1, 2010, and received the Memorandum and Subscription Booklet on or before that date. [Doc. No. 66-1]. Accordingly, Plaintiff's claim accrued no later than March 1, 2010, for the initial investment. However, Plaintiff did not file his Complaint until January 6, 2014, which is over three years later. Consequently, Plaintiff's cause of action for violation of the Oklahoma Uniform Securities Act, as it relates to this initial investment, is barred by the two-year statute of limitations.

Plaintiff invested again in the Partnership on or before March 24, 2011, in the amount of just over $500,000. [Doc. Nos. 66-5, 66-6]. As part of his "Additional Subscription Request" pertaining to the second investment on March 24, 2011, Plaintiff reaffirmed all of the representations, warranties, and acknowledgements previously made in the Subscription

Agreement pertaining to the initial investment and again opted out of the Partnership's alternative investment program. [*Id.*]. Accordingly, Plaintiff's claim accrued no later than March 24, 2011, for the second investment. Plaintiff filed his Complaint on January 6, 2014, over two-and-one-half years later. Accordingly, Plaintiff's claim for violation of the Oklahoma Uniform Securities Act is barred under OKLA. STAT. tit. 71 § 1-509(J)(2) as it relates to this second investment. Accordingly, Plaintiff's claim under the Oklahoma Uniform Securities Act is time-barred.

### C.     Actual and Constructive Fraud (Counts IV and V)

The statute of limitations for fraud in Oklahoma is set forth in OKLA. STAT. tit. 12 § 12-95(A)(3). This statute requires a plaintiff to bring an "an action for relief on the ground of fraud" within "two (2) years" after the cause of action shall have accrued, but "the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud." OKLA. STAT. tit. 12, § 12-95(A)(3). "Discovery" of an injury is deemed to occur when the injured party "knows or, in the exercise of reasonable diligence, should have known of the injury." *Ballard v. Johnson & Johnson*, 2014 WL 5341851, at *4 (N.D. Okla. Oct. 20, 2014). (quoting *Digital Design Group, Inc. v. Information Builders, Inc.*, 24 P.3d 834, 841 (Okla. 2001)). "The statute of limitations is not tolled simply because a plaintiff negligently refrains from prosecuting inquiries plainly suggested by the facts." *Id.* at *5 (quoting *Erikson v. Farmers Group, Inc.,* 2005 WL 2651312, at *3 (10th Cir. Oct. 18, 2005) (unpublished)).

A plaintiff "discovers" fraud when he or she "ascertains each element of the claim." *Horton*, 345 P.3d at 363. The Oklahoma Supreme Court has defined actual fraud as "the intentional misrepresentation or concealment of a material fact, with an intent to deceive, which substantially affects another person" and constructive fraud as "a breach of a legal duty or

equitable duty to the detriment of another, which does not necessarily involve any moral guilt, intent to deceive or actual dishonesty of purpose." *Id.* (quoting *Croslin v. Enerlex, Inc.*, 308 P.3d 1041, 1046 (Okla. 2013)).

As discussed above, Plaintiff in this case is charged with knowledge of the information contained within the Memorandum and Subscription Booklet. *See Zobrist*, 708 F.2d at 1518; Section VII.B, above. Accordingly, Plaintiff should have "discovered" Defendants' alleged misrepresentations or concealment of material facts no later than March 1, 2010, with respect to the first investment, and no later than March 11, 2011, with respect to the second investment. Accordingly, Plaintiff's claim for constructive fraud is time-barred as a matter of law pursuant to the two-year statute of limitations.

With respect to actual fraud, however, it remains an issue of material fact when Plaintiff discovered or should have discovered that Defendants allegedly acted with an intent to deceive, which is a necessary element of an actual fraud claim. As a result, Plaintiff's claim for actual fraud is not barred by the statute of limitations at this summary judgment stage. Nonetheless, as discussed above in Section V, this claim fails on the merits as a matter of law.

### D. Breach of Fiduciary Duty

The statute of limitations for breach of fiduciary duty is set forth in OKLA. STAT. tit. 12, § 12-95(A)(3). *Slover v. Equitable Variable Life Ins. Co.*, 443 F. Supp. 2d 1272, 1282 n.13 (N.D. Okla. 2006). This statute requires a plaintiff to bring such a claim within "two (2) years" after "the cause of action shall have accrued." OKLA. STAT. tit. 12, § 12-95(A)(3). Under Oklahoma law, this limitations period "does not begin to run until the wrongdoing has been or, in the exercise of reasonable diligence, should have been discovered." *F.D.I.C. v. UMIC, Inc.*, 136 F.3d 1375, 1380 (10th Cir. 1998).

For the reasons stated above, Plaintiff is charged with being aware of the alleged misrepresentations as of the date he was provided with the Memorandum and Subscription Agreement. As a result, Plaintiff should have been aware of Defendants' alleged breach of fiduciary duty no later than March 1, 2010, with respect to the first investment, and no later than March 11, 2011, with respect to the second investment. Accordingly, Plaintiff's claim for breach of fiduciary duty is barred pursuant to the two-year statute of limitations.

## **CONCLUSION**

For the reasons outlined above, the Court concludes that Plaintiff cannot prove his claims for violations of the Securities Exchange Act of 1934 (Count I), breach of contract (Count III), and actual fraud (Count IV). The Court further concludes that Plaintiff's claims for violations of the Oklahoma Uniform Securities Act (Count II), constructive fraud (V), and breach of fiduciary duty (Count VI) are all barred by the applicable statutes of limitation. Accordingly, Defendant Paul Ross's Motion for Summary Judgment [Doc. No. 66] and Defendant Anthony Stacy's Motion for Summary Judgment [Doc. No. 68] are **GRANTED**.

James H. Payne
United States District Judge
Northern District of Oklahoma